UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KRISTOPHER McDONALD, | ) | NO. 1:24-cr-00090-TWP-MJD |
| a/k/a Barone Santiago, | ) | |
| a/k/a Solja, | ) | |
| | ) | |
| Defendant, | ) | |

**GOVERNMENT'S TRIAL BRIEF**

The United States of America, by counsel, John E. Childress, Acting

United States Attorney for the Southern District of Indiana, and Bradley A.

Blackington, Assistant United States Attorney, files the following Trial Brief.

## I.    PROCEDURAL BACKGROUND

Defendant Kristopher McDonald is charged in an eight-count Second

Superseding Indictment ("Indictment").   Count One of the Indictment charges

McDonald with Murder in Aid of Racketeering, in violation of 18 U.S.C. §

1959(a)(1).   Count Two of the Indictment charges the defendant with

Brandishing and Discharging a Firearm During a Crime of Violence, in

violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (A)(ii), and (A)(iii).   Count Three of the

Indictment charges the defendant with Possession of a Firearm by a Convicted

felon, in violation of 18 U.S.C. § 922(g)(1).   Counts Four and Five of the

1

Indictment charge the defendant with Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1951(a)(1) and (b)(1).    Count Six of the Indictment charges the defendant with Enticing an Individual to Travel in Interstate Commerce to Engage in Prostitution, in violation of 18 U.S.C. § 2422(a).    Counts Seven and Eight of the Indictment charge the defendant with Using a Facility in Interstate Commerce to Promote a Prostitution Enterprise, in violation of 18 U.S.C. § 1952(a)(3).

Trial is scheduled to begin on May 2, 2025.    This Trial Brief will discuss the elements of Counts One and Four through Eight of the Indictment, along with some evidentiary issues that the government believes will arise in this case.

## II.    COUNT ONE:    MURDER IN AID OF RACKETEERING

Count One of the Indictment alleges a violation of the Violent Crimes in Aid of Racketeering ("VICAR") statute, which is codified at 18 U.S.C. § 1959. The statute specifically alleges that the defendant committed murder, as defined in Indiana Code Section 35-42-1-1(2), which is Indiana's felony murder statute.

The VICAR statute requires the government to prove (1) the existence of an "enterprise" as defined in 18 U.S.C. § 1959(b)(2); (2) the charged enterprise engaged in, or its activities affected, interstate or foreign commerce; (3) the charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1); (4) the defendant committed one of the enumerated

2

crimes under state or federal law (here a violation of Indiana's murder statute); and (5) such underlying crime was committed to maintain or increase his position in the criminal enterprise.   *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005); *see also United States v. Phillips,* 239 F.3d 829 (7th Cir. 2001).   The government will address each of these elements in turn.

**A.    First Element:   Existence of an Enterprise**

The first element of the VICAR statute requires the government to prove the existence of an enterprise.   The VICAR statute defines an "enterprise" to include "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."   18 U.S.C. § 1959(b)(2).   The term "enterprise" under the VICAR statute has the same meaning as the term "enterprise" under the RICO statute. *Phillips,* 239 F.3d at 843.   Consequently, the same body of law governing the meaning of an "enterprise" under the RICO statute applies to the VICAR statute.

The term "enterprise" applies not only to legal entities, but also to "association-in-fact" enterprises.   *United States v. Turkette,* 452 U.S. 576, 581-82 (1981).   An association-in-fact enterprise refers to a group of people associated together for the common purpose of engaging in a course of conduct.   *Turkette,* 452 U.S. at 583; *Phillips,* 239 F.3d at 843.   The existence of an association-in-fact enterprise is proven by evidence of an ongoing

association (either formal or informal) and by evidence that the various associates function as a continuing unit.   *Turkette,* 452 U.S. at 583.

The enterprise charged in this case is not a formal, legal entity.   It is instead an association-in-fact enterprise in which the members of the enterprise were associated together for the common purpose of engaging in sex trafficking activity.

An enterprise does not need to have a formal, hierarchical structure or a chain of command.   *Boyle v. United States,* 556 U.S. 938, 948 (2009). Instead, the government need only prove "a continuing unit that functions with a common purpose."   *Id.*   Similarly, the definition of enterprise is not limited to sophisticated and complex crimes.   *Id.*   Instead, the government only needs to prove three basic structural features to establish the existence of an enterprise – (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.   *Id.* at 946.

In the case at bar, the government will prove that the purpose of the charged enterprise involved the promotion of sex trafficking activity.   The government will establish that a relationship existed among those associated with the enterprise – Kristopher McDonald operated the day-to-day activities of the sex trafficking operation by trafficking Victim I.T. and Victim S.W., while Shelley Dukes posted advertisements over the internet that promoted the enterprise's sex trafficking activity.

4

The government will show that a relationship existed among those associated with the enterprise – McDonald served as the pimp, directing the sex trafficking activity of Victim I.T. and S.W., and Dukes communicated with McDonald regarding the content of the internet advertisements and posted the specific internet advertisements requested by McDonald.

The government will show sufficient longevity to permit McDonald and his associates to accomplish the purpose the enterprise – the promotion of sex trafficking.   No "hard-and-fast time period" exists to satisfy the longevity requirement under the RICO statute.   *United States v. Pierce,* 785 F.3d 832, 838 (2nd Cir. 2015).   To meet the longevity requirement, the government must prove either a closed period of repeated conduct or past conduct which, by its nature, projects into the future with the threat of repetition.   *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 241 (1989).   In the case at bar, the government will prove both.   The enterprise lasted for approximately ten months, during which the defendant and his associates engaged in sex trafficking activity that was repeated not only on a daily basis, but on numerous occasions throughout each day.   Moreover, the repeated and coercive nature of the activity suggests that the activity would project well into the future, with a high threat of repetition.   The length of the relationship, the degree to which the conduct was repeated, and the use of coercion, which creates a high threat that the activity would project well into the future, meets the longevity requirement required to prove the enterprise element to the

VICAR statute.

Proof of enterprise does not require the government to show that every member of the enterprise participated in or knew about all of the activities of the enterprise. *United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir. 1983); *United States v. Hewes,* 729 F.2d 1302, 1310-11 (11th Cir. 1984); *United States v. Rastelli,* 870 F.2d 822, 827-28 (2d Cir. 1989). Rather, it is sufficient to show that the members of the enterprise "know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Rastelli,* 870 F.2d at 828; *see also United States v. Schell,* 775 F.2d 559, 569 (4th Cir. 1985); *United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir. 1984).

The evidence that the government anticipates presenting in this case, therefore, meets the standard set forth in *Turkette* and *Boyle.* The government will establish an association-in-fact enterprise in which the members of the enterprise acted toward a common purpose, the promotion of sex trafficking activity. The evidence will prove the structure requirement articulated in *Boyle,* as the evidence will show that the members of the enterprise shared a common purpose (the promotion of sex trafficking activity), a relationship existed among the persons associated with the enterprise, and the enterprise had sufficient longevity to permit the members of the enterprise to accomplish the purpose of the enterprise. Consequently, the evidence that the government anticipates presenting will satisfy the enterprise element of the VICAR statute.

**B.     Second Element:   Interstate Commerce**

The second element of the VICAR statute requires the government to prove that the enterprise was "engaged in, or the activities of which, affect, interstate or foreign commerce."   18 U.S.C. § 1959(b)(2).   Preliminary, it is noted that the government does not need to establish that the particular violent crime alleged in the VICAR count (here the murder of TreShawn Glenn) affected interstate commerce.   *United States v. Odum,* 878 F.3d 508, 517 (6th Cir. 2017).   The government only needs to prove that the enterprise as a whole either engaged in interstate commerce or that its activity affected interstate commerce.   *Id.* (citations omitted).   The government only needs to establish a *de minimis* connection to interstate commerce to meet this element.   *Id.*   The government's evidence will establish that the enterprise's activity affected interstate commerce for the reasons outlined in Section III.B of this Brief.

**C.     Third Element:   Charged Enterprise Engaged in Racketeering Activity**

The third element of the VICAR statute requires the government to prove that the enterprise engaged in racketeering activity.   This element requires the government to prove that the charged enterprise engaged in "racketeering activity," as defined by 18 U.S.C. § 1961.   18 U.S.C. § 1959.   Racketeering activity refers to an enumerated list of predicate federal or state crimes set forth in the RICO statute.   *Id.* § 1961.   These crimes include violations of 18 U.S.C. § 1591(a) (Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. §

2422 (enticing an individual to travel in interstate commerce to engage in prostitution), 18 U.S.C. § 1951 (Travel Act), and 21 U.S.C. § 841(a)(1) (distribution of controlled substances).   § *Id.*   To prove that the enterprise engaged in racketeering activity, the government must prove that the enterprise committed a series of criminal acts as defined by 18 U.S.C. § 1961.   *Phillips,* 239 F.3d at 843; *United States v. Pimentel,* 346 F.3d 285, 296-97 (2d Cir. 2003).

Since association-in-fact enterprises act through their individual members, proving this element requires attention to the ways in which the individual members acted for the group.   *Id.* at 297.   In the instant case, the government will prove that the defendant committed each of the predicate crimes set forth in the indictment and that other members of the enterprise likewise committed some of these crimes.   The government will prove that the defendant committed the crime of Sex Trafficking by Force, Fraud, or Coercion, codified at 18 U.S.C. § 1591(a), as discussed in Section III of this Brief.   The government will prove that the defendant enticed Victim I.T., Victim S.W., and Victim S.R. to travel in interstate commerce to engage in prostitution, in violation of 18 U.S.C. § 2422 (enticing an individual to travel in interstate commerce to engage in prostitution).   The government will prove that the defendant and Shelley Dukes committed violations of 18 U.S.C. § 1951 (Travel Act) by engaging in financial transactions and internet activity that crossed state and international lines.   The government will also prove that the

defendant committed violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances) by delivering crack cocaine to prostitutes working for the enterprise.

In the case at bar, the government will establish that the enterprise engaged in all of the violations specified in the Indictment and, therefore, that the enterprise engaged in racketeering activity.

### C. Fourth Element:  The Defendant Committed Murder in Violation of Indiana Criminal Code Section 35-42-1-1(2)

### 1. Substantive Crime

The fourth element of the VICAR statute requires the government to prove that the defendant committed one of the enumerated crimes under state or federal law that are set forth in 18 U.S.C. § 1959(1).   The specific offense charged in the Indictment is the crime of murder, as defined by Indiana Criminal Code Section 35-42-1-1(2).   Murder in violation of state law is one of the enumerated crimes set forth in the VICAR statute.   18 U.S.C. § 1959(1). Indiana Criminal Code Section 35-42-1-1(2) provides that "a person who kills another human being while committing or attempting to commit... promotion of human sexual trafficking... commits murder...."  I.C. § 35-42-1-1(2).

In the case at bar, the defendant engaged in the sexual trafficking of Victim S.W.   During a sexual encounter that the defendant arranged between Victim S.W. and TreShawn Glenn, Glenn removed his condom and ejaculated on the back of Victim S.W.   A brief argument ensued between Victim S.W. and

Glenn.   The defendant emerged from an adjacent room with his pistol drawn and demanded that Glenn pay more money for the sexual services that he had received from Victim S.W. because he ejaculated on Victim S.W.'s back.   Glenn drew his firearm and shot at the defendant, injuring both the defendant and Victim S.W. in the process.   The defendant, who did not have a magazine or ammunition in his pistol, retreated to the adjacent room.   The defendant reemerged with the pistol, this time loaded with a magazine containing bullets, and shot Glenn in the back approximately fourteen times as Glenn attempted to flee the hotel room.   This evidence will show that the defendant killed Glenn while promoting human sexual trafficking.

The government believes that the defendant may argue that he acted in self-defense.   The following subsections of this Brief will discuss (1) whether federal or state law applies to the defendant's self-defense claim and (2) the law regarding self-defense in the appropriate jurisdiction.

### 2.    Self Defense:   Choice of Law

Where the underlying violent crime charged in a VICAR prosecution is a violation of state law, and the defendant raises the defense of self-defense, the court applies the law of self defense that exists under the appropriate state law. *United States v. Mallory,* 104 F.4th 15, 17 (8th Cir. 2024) (when predicate offense for VICAR charge is violation of state law, "state law defines its parameters, including potential defenses") (citing *United States v. Kehoe,* 310 F.3d 579, 588 (8th Cir. 2002)); *see also United States v. Hunt,* 99 F.4th 161,

189-90 (applying Virginia law in VICAR prosecution).

Consequently, any self-defense claim that the defendant raises to the murder charge must be interpreted in accordance with Indiana law.

### 3.    Self Defense Under Indiana Law

The defendant may argue that he engaged in self-defense when he confronted the TreShawn Glenn after hearing the argument between Victim S.W. and Glenn, that Glenn pulled out a gun and began to shoot at the defendant and Victim S.W., and that he shot Glenn in response.   The defendant may argue that he believed that he needed to use deadly force to protect himself and Victim S.W.

Indiana law, however, would not support such a self-defense argument. Indiana law permits a person to use deadly force without retreating if the person reasonably believes that the force is necessary to present serious bodily injury to himself or a third person.   Ind. Code § 35-41-3-2(c).   However, a person does not have the right to use force (deadly or otherwise) if "the person is committing or is escaping after the commission of a crime."   *Id.* § 35-41-3-2(g).   Indiana courts have modified the statutory limitation imposed by subsection (g) on a person's right to claim self-defense by requiring that the government to prove not only that the person was committing a crime, but that "there is an immediate causal connection between the crime and the confrontation."   *Turner v. State,* 183 N.E.3d 346, 355 (Ind. App. 2022) (citing *Gammons v. State,* 148 N.E.3d 301, 304-05 (Ind. 2020); *Mayes v. State,* 744

11

N.E.2d 390, 392 (Ind. 2001)).    The Indiana Supreme Court has held in a recent opinion that proving an "immediate causal connection" entails more than a "but for" connection between the crime and the confrontation, because such a formulation could preclude a defendant from raising a self-defense argument where the crime was only tenuously connected with the confrontation.    *Gammons,* 148 N.E.3d at 304.    Nonetheless, the Indiana Supreme Court left subsection (g) intact.

In the instant case, an immediate causal connection exists between the murder of TreShawn Glenn and Kristopher McDonald's human trafficking activity.    Glenn came to the hotel room to patronize one of the women whom McDonald trafficked.    During the resultant sexual activity, Glenn removed his condom and ejaculated on Victim S.W.'s person.    This conduct – which occurred during the sexual activity – caused McDonald to come out of the bedroom with his firearm, confront Glenn, and demand more money.    At that point, Glenn drew a weapon and shot at McDonald and Victim S.W. McDonald proceeded to shoot Glenn.    The murder was thus a direct result of the sexual activity.

Because an immediate causal connection existed between McDonald's human trafficking activity and the murder, the evidence in this case would not support any claim of self-defense.

Although Indiana law will not support a claim of self-defense in this case, the government understands that the evidence might develop in a manner that

allows the defendant to submit this argument to a jury.   In that situation, however, the Court must instruct the jury in accordance with the Indiana law on self-defense, as opposed to federal law.

### E.    Fifth Element:   Defendant Committed Murder to Maintain or Increase His Role in the Enterprise

The first element of the VICAR statute requires the government to prove that the defendant committed the murder of TreShawn Glenn "for the purpose of... maintaining or increasing position" in the charged enterprise.   18 U.S.C. § 1959(a).

The Second Circuit's opinion in *United States v. Concepcion,* 983 F.2d 369 (2nd Cir. 1992), remains the seminal opinion interpreting the purpose element of the VICAR statute.   In *Concepcion,* the Second Circuit noted that the legislative history of the VICAR statute did not require proof that a defendant's self-promotion in an enterprise served as either his only or primary concern to meet the purpose element.   *Concepcion,* 983 F.2d at 381.   Instead, the legislative history indicated that Congress included the phrase "maintaining or increasing position" to proscribe violent crimes committed "as an integral aspect of membership" in an enterprise.   *Id.* (citing S.Rep. No. 225, at 304).   Given the legislative history of the statute and the fact that Congress intended that the VICAR statute be "liberally construed to effectuate its remedial purposes," the Second Circuit rejected the suggestion that the purpose element requires the government to prove that maintaining or

increasing position in the enterprise was the defendant's sole or principal motive.  *Id.*   Instead, the statute simply requires that the jury could properly infer that the defendant committed the violent crime either "because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."  *Id.*   Other appellate courts have followed the Second Circuit's lead in interpreting the purpose requirement of the VICAR statute.  *United States v. Tse,* 135 F.3d 200, 206 (1st Cir. 1998); *United States v. Fiel,* 35 F.3d 997, 1004 (4th Cir. 1994) (sufficient if jury could infer that violent crime is committed as "an integral aspect of membership" in the enterprise); *United States v. Wilson,* 116 F.3d 1066, 1078 (5th Cir. 1997) (sufficient if jury could infer that violent crime is committed as "an integral aspect of membership" in the enterprise); *United States v. Banks,* 514 F.3d 959, 970 (9th Cir. 2008) (sufficient if jury could infer that violent crime was committed with the general purpose of maintaining or enhancing position in enterprise or as "an integral aspect of membership" in the enterprise); *United States v. Smith,* 413 F.3d 1253, 1277-78 (10th Cir. 2005).   Appellate courts, however, have vacated VICAR convictions based upon proof deficiencies regarding the purpose element when the evidence showed that the violent crimes were "purely mercenary" or where the defendant was neither a member of the enterprise nor involved in its criminal activities.   *United States v. Bruno,* 383 F.3d 65, 83 (2nd Cir. 2004); *United States v. Dhinsa,* 243 F.3d 635, 672 (2nd Cir. 2001).

14

In the instant case, when Kristopher McDonald recruited women to work for his enterprise, he exploited their physical vulnerability and their perceived need for protection.  McDonald emphasized to the women that his presence and involvement was essential to ensure their safety and he promised to protect them.  McDonald made this point clear to Victim S.R. when he recruited her to become a prostitute for him.  McDonald explained his relationship with Victim S.W. to Victim S.R. in a Facebook Messenger exchange on August 15, 2023, explaining that "she [Victim S.W.] might had to sell some pussy but guess what she get everything she want and *she has the protection she need that way no 1 will hurt her and u can have the same thing baby*" (emphasis added).  McDonald demonstrated and emphasized his ability to provide security for Victim S.W. as he asserted dominance over Victim S.W.. After Victim S.W. was raped by a prostitution client, McDonald assaulted the client.  McDonald then told Victim S.W. about the assault.  McDonald's commission of this crime of violence demonstrated to Victim S.W. that he would guarantee her safety.

McDonald promised to protect Victim S.W. against future clients that might exploit her.  When Tre Shawn Glenn removed his condom and began to argue with Victim S.W. on October 11, 2023, McDonald emerged from the adjacent bedroom with a firearm and confronted Glenn.  After Glenn drew his Glock firearm and shot both Victim S.W. and McDonald, McDonald obtained a loaded magazine, inserted it into the Glock firearm, and discharged numerous

rounds at Glenn until he perished.    Certainly, if McDonald would have failed to assault and kill Glenn, he would have failed in his duty to "protect" Victim S.W.    Borrowing the phraseology of *Concepcion,* McDonald knew that the violent act was expected of him by virtue of his position as the leader of the enterprise and as the supposed guarantor of the safety of Victim S.W. and Victim I.T..    Had he not shot and killed Glenn, Victim S.W. and Victim I.T. may have questioned McDonald's ability to "protect" them and stopped prostituting for him.    The defendant's use of violence constituted an integral aspect of his role in the enterprise and a jury could reasonably infer that he committed the murder to maintain his position as the leader of the enterprise.

McDonald made this point clear to Victim S.W. after the murder.    As McDonald traveled with Victim S.W. to various cities and continued the activities of the enterprise after the murder, McDonald repeatedly told Victim S.W. that he shot Glenn to protect her and emphasized that she needed his continued protection.    Appellate courts have found similar post-murder statements crucial in supporting the inference that a defendant committed a murder to maintain their position in an enterprise.    *See United States v. Diaz,* 176 F.3d 52, (2nd Cir. 1999) (defendant's statement to girlfriend that "you go all out for the Family and this is how they repay you" supported inference that defendant murdered suspected informant to maintain his role in narcotics enterprise).

A jury could reasonably infer based upon McDonald's previous

16

guarantees of protection to the women, his conduct during the murder, and his post-murder statements to Victim S.W. that McDonald confronted and ultimately murdered Glenn to cement his supervisory position in the enterprise and confirm Victim S.W.'s perceived need to have him "protect" her. Numerous appellate decisions have upheld challenges to the purpose element of the VICAR statute made by leaders of VICAR enterprises in similar circumstances as McDonald's murder of Glenn.    *See United States v. Pimentel,* 346 F.3d 285 (2nd Cir. 2003) (purpose element satisfied when jury could reasonably infer that defendant ordered murder to preserve her authority as leader of enterprise); *Diaz,* 176 F.3d at 95-96 (purpose element satisfied when jury could reasonably infer that defendant sanctioned murder because it was expected of him as high-ranking leader of organization to protect block's drug business and the "failure to do so would have undermined his leadership position" within the enterprise); *Dhinsa,* 243 F.3d at 672 (purpose element found when jury could reasonably infer that defendant's actions were motivated by expectation that as a leader of the enterprise he would "take action aimed at protecting the enterprise's operations" and that a "failure to do so would have undermined his leadership position" within the enterprise); *Banks,* 514 F.3d at 972 (purpose element met when jury could reasonably infer that defendant committed murder because members of enterprise expected that defendant would respond to perceived slights with violence and defendant had concerns with not appearing weak).

Based upon the anticipated evidence described above, the government expects to establish the purpose element of the VICAR statute.

## III.    COUNTS FOUR AND FIVE:    SEX TRAFFICKING BY FORCE, FRAUD, OR COERCION

Counts Four and Five of the Indictment charge the defendant with sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1951(a)(1) and (b)(1).[1]    This offense has three elements:    (1) the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) the defendant knew, or acted in reckless disregard of the fact, that force, fraud, or coercion, or any combination of such means, would be used to cause the person to engage in a commercial sex act; and (3) the defendant's acts were in or affecting interstate commerce.    18 U.S.C. §§ 1591(a)(1) and (b)(1).

### A.    First Element:   Defendant Knowingly, Recruited, Enticed, Harbored, Transported, Provided, Obtained, or Maintained the Victims

---

[1] 18 U.S.C. § 1591 is part of a series of statutes passed under the Trafficking Victims Protection Act of 2000 ("TVPA").   These statutes, which are codified at 18 U.S.C. §§ 1589 through 1594, prohibit a broad range of conduct relating to the trafficking crimes of exploiting another person for compelled or coerced labor, services, or commercial sex.   In passing the TVPA, Congress "intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten to harm third person, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.   H.R. Conf. Rep. No. 106-939, at 101 (2000).   Congress created the TVPA so that "federal prosecutors will not have to demonstrate physical harm or threats of force against victims."   *Id.*   In passing this legislation, Congress used several terms such as "serious harm" that apply to several of the statutes enacted under the TVPA. Consequently, courts have applied case law handed down under one of the prongs of the TVPA other than 18 U.S.C. § 1589 to illuminate the meaning of terms contained within 18 U.S.C. § 1589.

The knowing commission of any one of the specified acts listed in the first element – recruiting, enticing, harboring, transporting, providing, obtaining, or maintaining – violates the statute.   18 U.S.C. § 1591(a)(1) (using "or" when listing the specified means of the first element); *see also United States v. Mickey,* 897 F.3d 1173, 1182 (9th Cir. 2018) (holding that section 1591 lists alternative means of satisfying an element and the lower court did not err in declining to instruct jurors to unanimously agree on single means).   Because the acts listed in this element are not specifically defined by the statute, the jury should use their ordinary, everyday definitions.   *See Smith v. United States,* 508 U.S. 223, 228 (1993) (""When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

Although the government only needs to prove one of these acts, the government will show that the defendant committed all of these acts.   The testimony of the victims will establish that the defendant engaged in the following specific acts:   (1) the defendant recruited, enticed, and obtained the victims for the purposes of his sex trafficking activities by making false statements that he could procure employment for them in nightclubs, that they would have a luxurious and lavish lifestyle, and/or that they would have an exclusive romantic partnership if they associated with him; (2) the defendant transported the victims to hotels where they engaged in commercial sex for his profit; (3) the defendant maintained the victims by providing them with shelter, food, and condoms; (4) the defendant harbored the victims in various hotels;

and (5) the defendant provided the victims to prostitution customers by advertising her on an internet website.   The government, therefore, anticipates that it will present sufficient evidence to establish that the defendant recruited, enticed, harbored, transported, provided, obtained, or maintained the victims in violation of the first element of 18 U.S.C. § 1591.

**B.    Second Element:   Defendant Knew or Recklessly Disregarded That Force, Fraud, or Coercion Would be Used to Cause the Victims to Engage in Commercial Sex**

As to the second element, the government must prove that the defendant knew or recklessly disregarded that "force, threats of force, fraud, coercion... or any combination of such means would be used to cause the [victim] to engage in commercial sex."   18 U.S.C. § 1591(a)(2).

Knowledge or reckless disregard of any one of these prohibited means – force, fraud, or coercion – is sufficient to prove this element.   *United States v. Bell,* 761 F.3d 900, 908 (8th Cir. 2014) (section 1591(a) defines "sex trafficking" in the disjunctive, so the government only needs to prove one of these prohibited means); *United States v. Walker,* 73 F.4th 915, 928 (11th Cir. 2023) (finding sufficient evidence supporting conviction for section 1591 where "the government proceeded only under a theory of coercion").   The evidence in the case at bar, however, establishes that the defendant specifically knew about the force, fraud, and coercion because he perpetuated it himself.

**1.    Definition of Commercial Sex**

The term "commercial sex" refers to "any sex act, on account of which

anything of value is given to or received by any person."   18 U.S.C. §
1591(c)(3).   The term "commercial sex" is thus synonymous with prostitution;
that is, providing money in exchange for sex.

### 2.    Definitions of Force, Fraud, and Coercion

Because the statute does not define the terms "force," "fraud," and
"coercion," these terms are given their ordinary meaning.   *See Smith,* 508 U.S.
at 228.

"Force" means any form of power, violence, or pressure directed against
another person and includes physical violence and non-physical forms of
control.   *Bell,* 761 F.3d at 908-09 (approving jury instruction in section 1591
prosecution and explaining that "[t]his definition of 'power' is not limited to
physical abuse only"); *United States v. Chacon,* 533 F.3d 250, 257 (4th Cir.
2008) ("the use of force involves a degree of compulsion, it can be effected
through 'power' or 'pressure' which do not necessarily have physical
components") (quoting *United States v. Romero-Hernandez,* 505 F.3d 1082,
1088 (10th Cir. 2007)).

"Fraud" means any act of deception, trickery, or misrepresentation.
Webster's New Riverside University Dictionary (Riverside Publishing Co. 1994)
(defining fraud); *Bell,* 761 F.3d at 908 (approving jury instruction in section
1591 prosecution where "[t]he defendant adopted a pattern of convincing these
women that he loved them and would take care of them at the exclusion of all
others.   He convinced them that they would be financially secure, emotionally

21

secure, and loved.").

"Coercion" is broadly defined by statute to include (A) "threats of serious harm to or physical restraint against any person" or (B) "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person."   18 U.S.C. § 1591(e)(2).   The phrase "serious harm" means "<u>any</u> harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."   18 U.S.C. § 1591(e)(5) (emphasis added).

The plain language of 18 U.S.C. § 1591 thus encompasses both violent and nonviolent forms of coercion.   *See United States v. Purcell,* 967 F.3d 159, 193-94 (2d Cir. 2020) (finding sufficient evidence of coercion, even though defendant never "used force or discussed the use of force," when defendant's cumulative actions "were imbued with palpable threatening subtext"); *United States v. Nnaji,* 447 F.Appx. 558, 559 (5th Cir. 2011) ("Serious harm can include psychological coercion").

In considering whether the threatened harm rises to the level of "serious harm," the proper inquiry is not whether any person, or a hypothetical reasonably prudent person, would feel compelled to engage in the commercial

sex.   Instead, the relevant analysis becomes whether the harm was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."   18 U.S.C. § 1591(e)(5).   When considering whether the harm threatened by the defendant constitutes "serious harm," the jury must consider the victim's special vulnerabilities, including any aspect of the victim's background, station in life, mental condition, experience, education, and socioeconomic status.   *See United States v. Kozminski,* 487 U.S. 931, 948, 952 ("The vulnerabilities of the victim are relevant in determining whether the... coercion or threats... could plausibly have compelled the victim to serve"); *United States v. Lacy,* 904 F.3d 889, 895 (10th Cir. 2018) (finding sufficient evidence of coercion where the victim "felt coerced into [the act] because of the vulnerable position she was in as a homeless woman whose car and belongings were now in the [defendant's] possession and control); *United States v. Veerapol,* 312 F.3d 1128, 1131-32 (9th Cir. 2002) (jury may consider "the victim's special vulnerabilities" when evaluating coercion).

### 3.    The Defendant Targeted Vulnerable Women

In the case at bar, the defendant targeted vulnerable women struggling with poverty, broken homes, and self-esteem issues.   The defendant then exploited these vulnerabilities by making promises of gainful employment, luxurious lifestyle, and/or an exclusive, romantic partnership.   It was only

after the defendant used his victims' vulnerabilities to ensnare them in the charged human trafficking enterprise that he employed physical force, threats of violence, sexual assault, and psychological coercion to compel them to engage in commercial sex for his financial benefit.

The government will present Facebook Messenger text message exchanges between the defendant and various women to demonstrate his *modus operandi* in contacting women over social media, attempting to identify their vulnerabilities, and then attempting to manipulate their vulnerabilities to induce them to join his human trafficking enterprise.   The government will also introduce Facebook Messenger exchanges between the defendant and the victims during which he identified their vulnerabilities, exploited them, and recruited them to join the charged enterprise.   The government will also present testimony about the socioeconomic status of the victims, as well as their family backgrounds, history of drug addiction (if any), self-esteem issues, and other evidence so that the jury can understand their backgrounds and circumstances.   Testimony about the victims' backgrounds will help the jury to properly evaluate whether the harm with which the defendant threatened the victims was sufficiently serious to induce them to engage in commercial sex activity for the defendant.   *See United States v. Campbell,* 764 F.3d 880, 892 (8th Cir. 2014) (testimony regarding victim's vulnerabilities, including a troubled past, help explain why victim continued to succumb to defendant's persuasion); *United States v. Alzanki,* 54 F.3d 994, 1002 (1st Cir. 1995) (holding

24

that "[i]t was entirely proper to instruct the jury to consider [the victim's] background and experience in assessing whether her fears were reasonable"); *United States v. Blake,* 868 F.3d 960, 975 (11th Cir. 2017) (victim's testimony about her difficult upbringing relevant "because they tended to make the fact that she ran away from home to prostitute herself more probable").

### 4.    The Defendant Used Fraud to Compel the Victims to Enagge in Commercial Sex

The defendant also used false promises to recruit the victims into his sex human trafficking enterprise.   The defendant initially promised Victim S.W. that he would obtain employment for her at a nightclub in Florida and then promised Victim S.W. an exclusive, romantic relationship and financial gain to recruit her into his enterprise.   The defendant likewise promised Victim I.T. that he would obtain employment for her at a nightclub in Chicago to recruit her into his enterprise.   The defendant displayed images of himself on his Facebook page that showed him with cash, expensive jewelry, and flashy cars to project an image that he actually had the means to provide the victims with financial opportunity.

The government will present evidence that while the defendant was promising an exclusive, romantic relationship to Victim S.W. that he was promising a similar relationship to several other women.   This evidence is relevant to show that the defendant's promises to Victim S.W. constituted fraud.   The government will also present images from the defendant's

Facebook page that show him displaying wealth that he did not actually have to entice Victim S.W. and Victim I.T. to join his enterprise. Like the evidence of his relationship with other women, this evidence becomes relevant to establish that the defendant used fraud to entice Victim S.W. to join his enterprise.

### 5. The Defendant Used Coercion to Compel the Victims to Engage in Commercial Sex

#### a. The Defendant's Use of Physical Force, Sexual Assault, and Threats of Violence Constituted Coercion

The defendant used physical violence to compel his victims to engage in commercial sex. The defendant assaulted Victim S.W. on multiple occasions, some of which were witnessed by Victim I.T.

As an initial matter, the government does not need to prove the use of physical restraints to establish coercion. The statute does not require proof of physical restraint, such as the use of chains, barbed wire, or locked doors, to establish sex trafficking by force, fraud, or coercion. *See* 18 U.S.C. § 1591(e)(2). In the instant case, the government expects to introduce evidence through victim testimony that the defendant violently assaulted Victim S.W. by striking her with his hands and pistol whipping her. The defendant also sexually assaulted both victims.

In addition to constituting the direct use of physical force, the defendant's violent actions coerced the victims because his conduct reasonably caused them to believe that he would subject them to "serious harm" in the

form of physical violence if they did not comply with his demands. *See United States v. Townsend,* 521 F.Appx 904, 906-07 (11th Cir. 2013) (testimony that defendant beat, threatened, and sexually assaulted victims sufficient to establish "force" under section 1591, even though victims started working voluntarily and had opportunity to escape); *United States v. Fulton,* 928 F.3d 429, 438 (5th Cir. 2019) (sufficient evidence of force, fraud, or coercion where the defendant "beat up" and "choked" his victims); *United States v. Geddes,* 844 F.3d 983, 992 (8th Cir. 2017) (affirming sex trafficking conviction when defendant hit victim on two occasions).

Further, under the definition of "serious harm," any violence committed by the defendant that the victims witnessed becomes relevant to determine whether the defendant coerced them to engage in commercial sex. In the case at bar, the defendant assaulted Victim S.W. in front of Victim I.T. The government anticipates testimony from Victim I.T. that she engaged in commercial sex for the defendant in part because she had seen him assault Victim S.W. and believed that the defendant would subject her to the same violence if she did not comply. The defendant's use of physical violence against Victim S.W. in the presence of Victim I.T., therefore, created a "climate of fear" that compelled Victim I.T. to engage in commercial sex out of fear that she would suffer serious harm in the form of violence. Furthermore, Victim S.W. witnessed the defendant murder TreShawn Glenn during the operation of the enterprise. The fact that Victim S.W. witnessed the defendant kill another

27

man in cold blood led her to fear future violence against herself if she either declined to engage in commercial sex at the defendant's demand or reported the defendant's conduct to law enforcement authorities.   The fact that the defendant committed acts of violence against other individuals thus becomes relevant to establish a "climate of fear" that led to the coercion of the victims. *See United States v. Harris,* 701 F.2d 1095, 1100 (4th Cir. 1983) (evidence that defendant beat other people than the victim relevant because it contributed to "reign of terror" that compelled involuntary labor under involuntary labor statute); *United States v. Webster,* 2011 WL 8478276, at *1-2 (9th Cir. Nov. 28, 2011) (unpublished) (sufficient evidence of force and coercion where defendant beat females with other victims present to "make an example" out of them); *United States v. Booker,* 655 F.2d 562, 566 (4th Cir. 1981) ("climate of fear" caused by beatings and assaults of victims and threats of similar treatment); *see also Campbell,* 764 F.3d 880, 888 (8th Cir. 2014) ("additional assaultive behavior [not directly related to prostitution]… could be viewed as a 'pattern' intended to make [the victim] believe that failure to continue with prostitution – by simply refusing, reporting it to the police, or leaving [the defendant] – would result in serious harm"); *Townsend,* 521 Fed.Appx at 906 (defendant's sexual assaults on victim established defendant's power over victim and constituted evidence of coercion in human trafficking prosecution).

      **b.**    **The Defendant's Manipulation of the Victims' Drug Addictions Constituted Coercion**

Withdrawal from drug use may constitute "serious harm" under 18 U.S.C. § 1591. *United States v. Mack,* 808 F.3d 1074 (6th Cir. 2015) (evidence sufficient to find that defendant coerced victims into prostituting themselves by initially supplying and then withholding drugs as part of plan or pattern intended to cause them to believe that failure to perform prostitution acts would result in serious harm); *United States v. Fields,* 625 Fed.Appx 949, 952 (11th Cir. 2015) (reasonable jury could have found that defendant coerced victims to engage in commercial sexual acts by manipulating their drug addictions and controlling their access to drugs, including withholding drugs from them and causing them to experience withdrawal sickness if they did not engage in acts of prostitution).

In the case at bar, the government expects to present testimony that the defendant forcibly caused Victim I.T. to ingest crack cocaine vapor and caused her to become addicted to crack cocaine. The defendant also caused Victim S.W. to begin using crack cocaine and become addicted to crack cocaine. After the defendant caused the victims to become addicted to crack cocaine, he manipulated their access to crack cocaine. The defendant often required the victims to obtain a specific amount of money per day from prostitution to receive crack cocaine, knowing that they would experience withdrawal symptoms if they did not receive the crack cocaine. The defendant also withheld crack cocaine from the victims if they did not engage in specific acts of commercial sex that he instructed them to consummate.

29

Based upon *Mack* and *Fields,* the defendant's manipulation of the victims' drug addictions (some of which he caused) constitutes coercion under 18 U.S.C. § 1591.

### 6.    Commonly Misapplied "Defenses" to Coercion

A search of federal caselaw pertaining to the human trafficking statute (18 U.S.C. § 1591) reveals that criminal defendants have commonly attempted to employ several "defenses" to negate coercion that do not constitute proper legal defenses.   First, defendants commonly attempt to argue that because victims might have initially consented to engage in prostitution, any subsequent prostitution activity could not have been coerced.   Second, defendants commonly attempt to argue that the fact that victims might have had the opportunity to escape from them proves the absence of coercion.   Third, defendants commonly argue that a victim derived some form of "benefit' from engaging in the prostitution activity and, therefore, the commercial sex activity could not have been coerced.

Federal courts have rejected all three of these attempted defenses.   This brief will address each of these arguments in turn

### a.    The Fact That a Victim Might Have Initially Consented to Engage in Prostitution Does Not Negate the Coerced Nature of Subsequent Prostitution Activity

In some human trafficking cases, the victim initially consents to engage in commercial sex with the pimp.   Defendants charged with violations of 18 U.S.C. § 1591 often attempt to argue that this initial consent to the commercial

sex activity negates the possibility that future commercial sex activity was coerced.

Federal courts, however, have consistently ruled that it is not a proper defense to the crime of sex trafficking by force, fraud, or coercion that the victims initially agreed to engage in commercial sexual activity for the defendant.   Instead, the courts have ruled that a victim's initial agreement to prostitute becomes irrelevant if the defendant later used force, fraud, or coercion to cause her to continue to prostitute.   *Kozminski*, 487 U.S. at 938 (citing *Harris,* 701 F.2d at 1100); *United States v. Shackney,* 333 F.2d 475, 484 n.13 (2d Cir. 1964); *United States v. Bibbs,* 564 F.2d 1165 (5th Cir. 1977) (affirming conviction where victims initially agreed to work for defendants).

In the instant case, the government expects Victim S.W. to testify that she initially welcomed the defendant to Indianapolis and agreed to share the proceeds of her prostitution activity with the defendant.   Several weeks later, however, the defendant began to use force and coercion to command all of the proceeds of Victim S.W.'s prostitution activity.   As the cases cited above indicate, even though Victim S.W. may have initially consented to the prostitution activity given the circumstances of her situation, the law remains clear that initial consent does not negate the coerced nature of any subsequent coerced prostitution activity.   The initial consent of Victim S.W., therefore, does not provide a legally cognizable defense under 18 U.S.C. § 1591.

### b. The Fact That the Victims Had the Opportunity to Escape Does Not Provide a Defense to Coercion

Nor is it a defense that the victims may have had the opportunity to escape.   The fact that a victim may have had an opportunity to leave is irrelevant if the defendant "placed [the victim] in such fear or circumstances that [she] did not reasonably believe [s]he could leave."   *Bibbs,* 564 F.2d at 1168 (defendant is guilty "if the defendant has placed [the victim] in such fear... that the victim is afraid to leave, regardless of the victim's opportunities for escape"); *United States v. Djoumessi,* 538 F.3d 547, 553 (6th Cir. 2008) (finding "unavailing... [the defendant's] contention that [the victim] necessarily remained voluntarily at his home because he never physically restrained her (in the sense of placing a lock on the door) and she never attempted to escape" because "opportunities for escape mean nothing if [the defendant] gave [the victim] reasons to fear leaving the house").

In the case at bar, the government expects the victims to testify that they did not attempt to "escape" because they feared that the defendant would subject them to additional physical violence or harm them.   In addition, the defendant knew that the victims had no other place to turn due to their socioeconomic circumstances and other issues, reminded them of their vulnerabilities, and took advantage of them.   Consequently, the victims' lack of effort to "leave" does not negate the defendant's guilt under 18 U.S.C. § 1951 because he consistently used violence, threats, fraud, and abuse to place his

victims in reasonable fear that they would incur serious harm if they tried to escape.

### c. The Fact That a Victim May Have Received a "Benefit" From the Prostitution Activity Does Not Negate the Coerced Nature of the Prostitution Activity

Nor is it relevant that the victims may have received some sort of "benefit" from the prostitution activity.   *United States v. Bradley,* 390 F.3d 145, 153 ("whether a person paid a salary or wage is not determinative... if a person is compelled to labor against his will by any one of the means prohibited... such service is forced, even if he is paid or compensated for the work").

In the instant case, the defendant may argue that the fact that he provided the victims with shelter and money for food and basic sustenance means that their sexual activity was not coerced.   Pursuant to *Bradley,* this argument does not constitute a legally cognizable defense under 18 U.S.C. § 1591.

### 7.    Conclusion

The evidence at trial will show that the defendant targeted women from broken homes and suffered from significant self-esteem issues and then exploited their vulnerabilities to compel them to prostitute.   The defendant lured the victims into the scheme using the false promises of obtaining employment in night clubs, an exclusive romantic relationship, and/or material wealth.   Once the victims fell under his

control and became dependent on him, the defendant employed a coercive scheme involving fear and intimidation, blackmail, the manipulation of drug addiction, threats of serious harm, and sexual and physical violence.   After placing the victims in fear, the defendant compelled their continued prostitution for his benefit.

### C.    Third Element:   The Defendant's Actions Were in or Affecting Interstate Commerce

As to the third element, the government must prove that the defendant's commerce was "in or affecting interstate commerce."   18 U.S.C. § 1591(a)(1). Generally speaking, "an act or transaction that is economic in nature and affects the flow of money in the stream of commerce to any degree affects interstate commerce."   *United States v. Walls,* 784 F.3d 543, 548 (9th Cir. 2015).   Given the breadth of activity that affects interstate commerce, "it is well established that the burden of proving a nexus to interstate commerce is minimal."   *United States v. Elias,* 285 F.3d 183, 188 (2d Cir. 2002) (discussing interstate commerce requirement in the context of the Hobbs Act).   A defendant's conduct affects the interstate commerce element even if the impact of the conduct is *de minimis.   Walls,* 784 F.3d at 546.   Furthermore, the government does not need to prove that the defendant knew or intended that his conduct affect interstate commerce.   *United States v. Evans,* 476 F.3d 1176, 1180 n.2 (11th Cir. 2007) (finding that the term "knowingly" does not modify the interstate commerce element of 18 U.S.C. § 1591).

The government anticipates that the evidence will show that the defendant used the internet to post advertisements for the enterprise's sex trafficking activity on the MegaPersonals website.   The defendant used Facebook Messenger to attempt to recruit women into his enterprise and communicated with his associates during the operation of the enterprise.   The defendant used cellular telephones to communicate with prospective prostitution clients, as well as the victims of his sex trafficking activity.   The defendant rented hotel rooms in which the victims conducted the sex trafficking activity.   The defendant also traveled with his victims across state lines from Indiana to Ohio to conduct sex trafficking activity.

The type of evidence that the government expects to offer in the instant case will establish the element of interstate commerce.   The defendant's use of the internet to post advertisements on the MegaPersonals website satisfies the element of interstate commerce.   *United States v. Gray-Sommerville,* 618 F.Appx 165, 168 (4th Cir. 2015) (defendant's advertisements of the victim on the internet site www.Backpage.com satisfied interstate commerce element). The defendant's use of Facebook and Facebook Messenger also satisfies this element.   *See United States v. Sutcliffe,* 505 F.3d 944, 953 (9th Cir. 2007) ("the internet is an instrumentality and channel of interstate commerce").   The defendant's use of a cellular telephone to communicate with prostitution clients and his prostitutes likewise satisfies the interstate commerce requirement.   *United States v. Pipkins,* 378 F.3d 1281, 1295 (11th Cir. 2004)

(use of cellular telephones affects interstate commerce); *United States v. Rodriguez-Cruz,* 681 F.Appx 312, 313 (5th Cir. 2017) (cellular telephones constitute facilities of interstate commerce and their use, even if wholly intrastate, is sufficient to establish the interstate element of federal crimes). The defendant's use of hotels also affected interstate commerce. *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258 (1964); *Evans,* 476 F.3d at 1179 (use of hotels that served interstate travelers sufficient to establish interstate commerce).

Consequently, the government anticipates that it will present evidence establishing that the defendant's illegal activities affected interstate commerce.

## IV.  COUNT SIX:  ENTICING AN INDIVIDUAL TO TRAVEL IN INTERSTATE COMMERCE TO ENGAGE IN PROSTITION

Count Six of the Indictment charges that the defendant knowingly persuaded, induced, and enticed Victim I.T. to travel in interstate commerce, from Mississippi to Indiana, to engage in prostitution.   This conduct violates 18 U.S.C. § 2422(a).

In order for the defendant to be found guilty of Count Six, the government must prove that the defendant knowingly transported Victim I.T. in interstate commerce to engage in prostitution.   It is not a defense that a person consented to travel for prostitution.   *See Gebardi v. United States,* 287 U.S. 112, 119 (1932) ("the statute is drawn to include those cases in which the woman consents to her own transportation); *Phillips,* 640 F.2d at 96 ("the

consent of the woman is no defense to a Mann Act charge").

The government will establish this count through the testimony of Victim I.T., as well as Facebook Messenger exchanges between the defendant and Victim I.T. and documents related to Victim I.T.'s travel between Mississippi to Indiana.

## V. COUNTS SEVEN AND EIGHT: USING A FACILITY IN INTERSTATE COMMERCE TO PROMOTE A PROSTITUTION ENTERPRISE

Counts Seven and Eight of the Indictment charge that the defendant used a facility in interstate commerce to promote a prostitution enterprise, in violation of 18 U.S.C. § 1952(a)(3). This statute is also known as the Travel Act. To establish a violation of 18 U.S.C. § 1952(a)(3), the government must prove three elements beyond a reasonable doubt: (1) the defendant used a facility in interstate commerce; (2) the defendant did so with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity; and (3) the defendant thereafter performed or attempted to perform the act alleged. *United States v. Hayes*, 775 F.2d 1279, 1282 (4th Cir. 1985).

With respect to the first element, the interstate nature of the defendant's use of a facility is "simply . . . a jurisdictional peg on which to hang the federal prosecution." *United States v. LeFaivre*, 507 F.2d 1288, 1297 n.4 (4th Cir. 1974); *United States v. Halloran*, 821 F.3d 321, 342-43 (2d Cir. 2016) ("As to the Travel Act, the government was required to prove that Halloran traveled

interstate or used a facility in interstate commerce (e.g., the telephone or the internet), or caused an agent to do so, with the intent to promote the underlying unlawful activity...   Purely intrastate use of an interstate facility is sufficient to violate the Travel Act"; finding evidence sufficient to satisfy jurisdictional element of § 1952 where defendant made interstate phone calls and sent interstate text message and emails, and where there was evidence that text messages sent by another were routed through a different state). Both the internet and telephones are facilities in interstate commerce as a matter of law.   *See United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) ("[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce."); *United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991) (identifying telephone as facility of interstate commerce); *United States v. Biaggi*, 853 F.2d 89, 104 (2d Cir. 1988) (same); *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) ("[T]he facility of interstate commerce' involved in this case – the Internet – is both 'an instrumentality and channel of interstate commerce.'" (citing *United States v. MacEwan*, 445 F.3d 237, 246 (3d Cir. 2006)).

With respect to the second element, the term "unlawful activity" means "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed."   18 U.S.C. § 1952(b)(1).   The statute's reference to state law serves "only to identify the type of 'unlawful activity' in which the defendant[] intended to engage. Proof that the unlawful

objective was accomplished or that the referenced law has actually been violated is not a necessary element." *United States v. Pomponio*, 511 F.2d 953, 957 (4th Cir. 1975); *see also United States v. Teplin*, 775 F.2d 1261, 1265 n.4 (4th Cir. 1985) ("While the Travel Act requires a determination that the underlying state law has been or could have been violated, 'accomplishment of the state substantive offense is not a prerequisite to a Section 1952 conviction.'"); *United States v. Hines, 696 F.2d 722, 725* (10th Cir. 1982) ("It is not the violation of state law which constitutes an offense under section 1952, but rather the use of interstate means for that purpose.").

Finally, with respect to the third element, any act in furtherance of the business enterprise will sustain a conviction. *United States v. Monu,* 782 F.2d 1209, 1211 (4th Cir. 1986) (finding that the defendant attempted to promote a business enterprise by simply unwrapping packages of heroin after they had traveled in interstate commerce). "This is not a significant hurdle" for the government. *United States v. Heim*, 15 F.3d 1092, 1994 WL 19017, at *4-5 (9th Cir. Jan. 24, 1994) (table decision) (meeting with person to discuss drug debt after interstate travel satisfied third element). "Unlike the crime of attempt, [Section 1952] does not require that the government establish that the accused took a substantial step in furtherance of the intended unlawful activity." *Id.* at 4 (quoting *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir. 1991)). "Moreover, the overt act itself need not be illegal." *United States v. Hassan*, 36 F.3d 1094, 1994 WL 532863, at *4 (4th Cir. Oct. 3, 1994) (table

decision) (defendant met with informant, bought subway tickets, and arranged to meet with informant again); *see also United States v. Blanco*, 844 F.2d 344, 352 (6th Cir. 1988) (telephone calls made by defendant after interstate travel satisfied third element).

With regard to Counts Seven and Eight of the Indictment, the government will prove that the defendant used the internet application CashApp to send money from Indiana to Ohio to enable Victim S.R. to travel from Ohio to Indiana to engage in prostitution activity.[2]   After Victim S.R. traveled from Ohio to Indiana to meet the defendant, the defendant transported Victim S.R., Victim I.T., and Victim S.W. back to Ohio.   After traveling to Ohio with the victims, the defendant sold Victim I.T. and Victim S.W. as prostitutes and attempted to sell Victim S.R. as a prostitute.

With regard to the racketeering activity element of 18 U.S.C. § 1959, the government will also prove that the defendant used the internet site Facebook Messenger to communicate with potential victims, accepted payment for prostitution services over CashApp, and used a cellular telephone to communicate with both prospective prostitution clients and the victims of his conduct.

---

[2] At all times covered in the Indictment, prostitution was illegal in both Indiana and Ohio. The Indiana Criminal Code provides that "a person at least eighteen (18) years of age who knowingly or intentionally performs, or offers or agrees to perform, sexual intercourse or other sexual conduct... for money or other property commits prostitution, a Class A Misdemeanor." Ind. Code. § 35-45-4-2(a)(1).   The Ohio Criminal Code provides that "[n]o person shall engage in sexual activity for hire."   29 Ohio R.C. § 2907.25(A).   Consequently, prostitution violated both Indiana and Ohio law.

## VI.   ANTICIPATED LEGAL ISSUES

### A.   HEARSAY

**1.   Several Statements Contained in Facebook Messages with the Defendant are Admissible to Provide Context for the Defendant's Statements**

A statement is not "hearsay" if it is offered against a party and is the party's own statement.   Fed. R. Evid. 801(d)(2)(A).   The government need only show that the defendant made the statements by a preponderance of the evidence for the statements to become admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence.   *See, e.g., United States v. Lang*, 364 F.3d 1210, 1222 (10th Cir. 2004).   In addition, "[i]t is well-settled that statements that are offered for context, and not for the truth of the matter asserted, are not hearsay as defined in Rule 801 of the Federal Rules of Evidence."   *United States v. Macari*, 453 F.3d 926, 941 (7th Cir. 2006).

In this case, the government obtained Facebook messages sent and received by the defendant, and several of these messages contain evidentiary value.   Specifically, the defendant made statements on Facebook concerning the operation of his prostitution enterprise and also repeatedly made the direct admission that he acted as a pimp.   The government will link the Facebook messages to the defendant through the fact that the communications occurred over his cellular telephone and the testimony of other participants in the conversation.   *See United States v. Browne*, 834 F.3d 403, 413 (3d Cir. 2016) (finding the defendant's Facebook messages properly authenticated, in part,

42

because the victims' trial testimony was consistent with the content contained in the Facebook chats); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (finding the defendant's Facebook messages properly authenticated because a witness testified that she had seen the defendant using Facebook, recognized his Facebook account, and recognized the defendant's style of communication). As such, the statements attributed to the defendant in the Facebook messages that will be presented at trial are properly admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence.

The statements of other individuals in the Facebook messages are admissible to provide the necessary context to make the defendant's statements in the course of the message exchanges and conversations intelligible. If the jury is not permitted to consider the other side of a message exchange or conversation, the defendant's responses and comments in these exchanges would be nonsensical and meaningless. Thus, the other statements and messages are necessary, not to prove the truth of the matter asserted, but to provide proper context for the defendant's admissions. *See United States v. Bermea-Boone*, 563 F.3d 621, 626 (7th Cir. 2009) (finding that the admission of recorded calls "were not offered for their truth, but to provide context for Bermea-Boone's admissions concerning the drug conspiracy and to make those admissions intelligible for the jury"); *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) (recognizing government informant's statements on recorded call with defendant admissible because it provides context for the

43

defendant's admissions); *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (finding that emails were not offered to prove the truth of the matters asserted, but rather they provided context for the defendants' messages sent in response); *Macari*, 453 F.3d at 941 (observing that without the other statements, the defendant's admissions "would not have made any sense").

### 2. The Defendant Cannot Offer his Own Prior Out-Of-Court Statements

The government intends to introduce evidence regarding numerous statements, both oral and written, that the defendant made to other individuals.   The government also intends to introduce evidence of verbal statements the defendant made to other witnesses, as well as text messages and Facebook messages that the defendant wrote and sent to others.   The government anticipates admitting evidence of the statements during its case-in-chief.

All of these statements are admissible pursuant to Rule 801(d)(2) of the Federal Rules of Evidence, which provides that a defendant's own statements are admissible, non-hearsay admissions of a party-opponent when offered into evidence by the United States.   *See* Fed. R. Evid. 801(d)(2)(A).   The government may offer all, some, or none of a defendant's statements at trial under Rule 801(d)(2).

A defendant, however, cannot use this rule to offer his own prior out-of-court statements.   Such statements are inadmissible hearsay because the

defendant is the proponent of the statement and thus the statements are not offered against him.   *See United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (noting that the rules of evidence do not "provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party"); *see also United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).    If the defendant wants to tell his side of the story, he must take the stand and testify under oath and be subject to cross-examination.   Indeed, even where the government elicits an inculpatory portion of a defendant's statement from a witness, the defendant is not entitled to elicit the exculpatory portion on cross-examination.   *See Wilkerson*, 84 F.3d at 696; *Ortega*, 203 F.3d at 682.

Moreover, the rule of completeness has no place in the analysis of the defendant's unrecorded and unwritten statements.   *Id.*   The rule of completeness does not "render admissible the evidence which is otherwise inadmissible under the hearsay rules."   *United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) (citation omitted).   With respect to the defendant's recorded statements, the rule of completeness is not violated so long as the "complete statement [does] not serve to correct a misleading impression in the edited statement that is created by taking something out of context."   *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (quotations omitted). Here, the government's proposed clips of the defendant's statements do not

45

create a misleading impression and so the rule of completeness does not apply.

**B.    SUMMARY EXHIBITS**

The government intends to call James Howe, a Special Agent with the Internal Revenue Service, as a witness.   Special Agent Howe will testify about his review and analysis of various CashApp records that the government subpoenaed in this case.

The anticipated testimony of Special Agent Howe regarding his analysis of various financial records collected during this investigation is not "expert" testimony because it is either summary testimony, or is rationally based on his perception.   *See United States v. Aubrey*, 800 F. 3d 1115, 1122, 1129 (9th Cir. 2015) (recognizing that a forensic auditor provided lay testimony under Fed. R. Evid. 701, and was not required to be certified as an expert witness, because he testified about matters to which he had personal knowledge, such as the documents and the methods he used to prepare his summary).   Essentially, Special Agent Howe's testimony summarizes voluminous financial records that the government subpoenaed in this case.

Rule 1006 of the Federal Rules of Evidence permits a party to introduce summaries or charts that "prove the content of voluminous admissible writings... that cannot be conveniently examined in court."   Fed. R. Evid. 1006.   The summary becomes admitted as substantive evidence and the party offering the summary is not obligated to introduce the underlying documents themselves.   *United States v. White,* 737 F.3d 1121, 1135 (7th Cir. 2013).   Rule

46

1006 only requires the government to make the underlying originals available

for examination.   Fed. R. Evid. 1006(b).   The government has provided the

original CashApp records to defense counsel through discovery.

Consequently, Special Agent Howe's testimony becomes admissible

under Rule 701 of the Federal Rules of Evidence and his summary exhibits

become admissible under Rule 1006 of the Federal Rules of Evidence.

Respectfully submitted,

JOHN E. CHILDRESS
Acting United States Attorney

*s/Bradley A. Blackington*

By:  _____
Bradley A. Blackington
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **April 28, 2025**, a copy of the foregoing was filed electronically.   Notice of this filing will be sent to opposing counsel by electronic mail.


*s/Bradley A. Blackington*

Bradley A. Blackington
United States Attorney's Office
10 W. Market St., Suite 2100
Indianapolis, IN   46204
Phone:   (317) 226-6333
Fax:   (317) 226-6125
E-mail: bradley.blackington@usdoj.gov